AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>OMAR MOESES GALLEGOS and<br>GIOVANNI SAMANO BUSTAMANTE | |
| | MAGISTRATE'S CASE NO.<br>19MJ02965 |

19MJ02965

FILED
CLERK, U.S. DISTRICT COURT

JUL 19 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Complaint for violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE JEAN P. ROSENBLUTH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>July 18, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [21 U.S.C. § 841(a)(1), (b)(1)(A)(viii)]

On or about July 18, 2019, in Los Angeles County, within the Central District of California, defendant OMAR MOESES GALLEGOS and defendant GIOVANNI SAMANO BUSTAMANTE knowingly possessed with intent to distribute a at least 50 grams of methamphetamine, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

LODGED

2019 JUL 19 PM 4:0

BY: _____

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Matthew J. Lozowski |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>JEAN P. ROSENBLUTH | DATE<br>July 19, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Veronica Dragalin x0647     REC: Detention

## AFFIDAVIT

I, Matthew J. Lozowski, being duly sworn, hereby depose and say:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against OMAR MOESES GALLEGOS ("GALLEGOS") and GIOVANNI SAMANO BUSTAMANTE ("BUSTAMANTE") for Possession with Intent to Distribute Methamphetamine in violation of 18 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).

2.   This affidavit is also made in support of an application for a search warrant for three digital devices seized during the arrest of GALLEGOS and BUSTAMANTE (the "SUBJECT DEVICES"), as further described in Attachment A.  The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

## II. BACKGROUND FOR SPECIAL AGENT MATTHEW J. LOZOWSKI

3.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") I have been employed by the DEA since December 2017.  My current assignment is to the Los Angeles Field Division (LAFD), Los Angeles, California, enforcement Group 4, charged with enforcing United States Code (U.S.C.) Title 21, the Controlled Substances Act.  Prior to the

LAFD, I attended the DEA Training Academy in Quantico, Virginia, where I received 18 weeks of specialized training in violations of the Controlled Substances Act. Prior to my employment with the DEA, I served in the United States Coast Guard for approximately four years. During my career there, I was regularly involved in numerous drug-related arrests and seizures.

4.    As a DEA SA, I have assisted in numerous investigations dealing with the possession, manufacturing, cultivation, distribution, and importation of controlled substances, as well as investigations involving the laundering of narcotics proceeds. In conducting and assisting in those investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance. I have participated and assisted in undercover operations and I have planned and executed various federal arrest and search warrants. I have interviewed narcotics traffickers and debriefed informants. Through my training, experience, interaction with other law enforcement officers, and discussion with senior investigators, I am familiar with the methods employed by narcotics traffickers to smuggle, safeguard, and distribute narcotics, and to collect and launder narcotics proceeds.

5.    Unless otherwise stated, the facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation, which I have received from other federal agents

2

and other law enforcement agencies.  Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

### III.  SUMMARY OF PROBABLE CAUSE

6.    On July 18, 2019, law enforcement agents arranged for a controlled purchase of methamphetamine and fentanyl pills by a confidential source from GALLEGOS.  The deal was arranged in advance by phone.  At the meeting time and location, BUSTAMANTE arrived in a separate car.  Law enforcement agents arrested GALLEGOS and BUSTAMANTE after the two completed the sale of 20 pounds of methamphetamine to the confidential source.  In the car, agents found an addition 120 pounds of methamphetamine. Agents also seized three cellular phones from GALLEGOS, BUSTAMANTE, and from the vehicle (the SUBJECT DEVICES).

### IV. STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, communications with other law enforcement officers, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A.    Background on Investigation**

8.    In July 2019, a Confidential Source[1] ("CS") informed
DEA Enforcement Group 4 agents that he/she had been in contact
with a narcotics trafficker in the Los Angeles area.  At the
direction of law enforcement, the CS began negotiating with the
target, known to the CS as "Gordito" (later identified as OMAR
MOESES GALLEGOS), to purchase approximately 20 pounds of
methamphetamine and 300 fentanyl pills.  The CS stated that the
target of the investigation was using phone number 818-824-2512.
The CS and GALLEGOS negotiated the transaction via "WhatsApp
Messenger" as well as recorded phone calls.

9.    In the days leading up to July 18, 2019, at the
direction of law enforcement, the CS negotiated an initial
purchase of one pound of methamphetamine and 100 fentanyl pills
from GALLEGOS to take place on July 18, 2019.

**B.    Controlled Drug Purchase on July 18, 2019**

10.    On July 18, 2019, DEA enforcement Group 4 agents,
Federal Bureau of Investigations ("FBI"), as well as Long Beach
Police Department officers met at a predetermined meet location
with the CS to make a controlled purchase of one pound of
methamphetamine and 100 fentanyl pills from GALLEGOS.

11.    Agents/officers arranged to have the deal take place
in the Target department store parking lot located at 4325 Del

---

[1] To the best of my knowledge, the CS is an informant who
has been working with the DEA since 2006 in exchange for
financial consideration.  The CS has a criminal history
involving drug possession.  The CS has participated as an
informant in multiple investigations and the information
provided by the CS has proven to be reliable.

Amo Boulevard, Lakewood, California.  At approximately 1:00
p.m., SA Jordan Lester searched the CS for contraband with
negative results.  The CS was then given $3,000.00 USD in
Official Advanced Funds (OAF) to purchase the narcotics.  At
around the same time, agents/officers established surveillance
at the meet location.

12.  At approximately 1:30 p.m., the CS arrived at the
Target store parking lot.  At the direction of law enforcement,
the CS placed a call to GALLEGOS, informing GALLEGOS of the meet
location.  At approximately 2:30 p.m., GALLEGOS arrived at the
Target store parking lot driving a white, newer model Chevrolet
Malibu with no license plates.  According to the CS, GALLEGOS
told the CS that the methamphetamine and fentanyl pills that
GALLEGOS agreed to provide were not at the location.  GALLEGOS
told the CS he was waiting on the shipment of methamphetamine
from Mexico and that he could provide the CS with 20 pounds of
methamphetamine and 300 fentanyl pills.  The CS agreed, and
GALLEGOS told the CS he would go to pick up the fentanyl pills
and bring them back to the CS while waiting for the shipment of
methamphetamine.

13.  At approximately 3:00 p.m., the CS departed the area
and surveillance was maintained on GALLEGOS by agents/officers.

14.  At approximately 4:30 p.m., the CS contacted GALLEGOS
for a status update on the location of the narcotics.  GALLEGOS
told the CS the methamphetamine would be arriving at 5 p.m. and
to meet back at the Target store parking lot.

15.   At approximately 6 p.m., the CS and GALLEGOS met at
the Target store parking lot, and the CS met with GALLEGOS in
GALLEGOS' vehicle.   At approximately 6:30 p.m., the CS and
GALLEGOS departed the vehicle to meet the third party delivering
the methamphetamine (later identified as GIOVANNI SAMANO
BUSTAMENTE).   The CS and GALLEGOS walked to the north side of
the Target store parking lot and approached a black 2007 Acura
TL (CA plate number 7YOB498).   At that time, GALLEGOS entered
the driver's side rear door of the Acura and the CS entered the
passenger's side of the Acura where he/she observed a white
plastic bag on the floor containing what he/she suspected to be
methamphetamine.   The CS asked the driver (BUSTAMANTE) if this
was the 20 pounds of methamphetamine for him/her, to which,
BUSTAMANTE replied "yes."

16.   At that time, the CS told GALLEGOS and BUSTAMANTE
he/she was going to make a call to bring the money in.   The CS
made a call to the case agent, and also gave the visual arrest
signal for agents/officers to move in.   Agents/officers moved in
and took GALLEGOS and BUSTAMANTE into custody.

17.   Subsequent to the arrests, agents/officers conducted a
search of BUSTAMANTE's vehicle and recovered approximately 20
pounds of suspected methamphetamine in the front passenger's
seat floorboard, as well as two large plastic bins in the trunk
containing approximately 60 pounds each of suspected
methamphetamine.

18.   During the search of GALLEGOS, agents found one
cellular telephone in his pocket (SUBJECT DEVICE 1), as well as

another cellular telephone in his Chevrolet Malibu (the SUBJECT DEVICE 2).  BUSTAMANTE was holding a cellular telephone (the SUBJECT DEVICE 3) during his arrest.

### C. Further Investigation of Suspected Drugs Found in the Car

19.  The methamphetamine was packaged in clear zip-lock style bags, approximately one pound per bag.  There were 20 bags in a white plastic shopping bag located in the front passenger's floor board of the black Acura TL.  Located in the trunk of the black Acura TL were two gray plastic tote bins sealed with red duct tape. Inside the bins were more one-pound clear plastic bags containing approximately 60 pounds of suspected methamphetamine in each of the gray bins.

### D. Suspect Interviews

20.  On July 19, 2019, agents interviewed GALLEGOS in a recorded Mirandized interview.  GALLEGOS agreed to speak to agents.  Although GALLEGOS denied knowledge of the substance found in BUSTAMANTE's vehicle, GALLEGOS stated that a person located in Sinaloa, Mexico, asked him to travel to Los Angeles to ensure that two people met for a deal.  According to GALLEGOS, the person in Mexico did not want the two people to communicate directly, but asked that GALLEGOS be the go-between the two.

21.  As of the time of this affidavit, agents have not yet attempted to interview BUSTAMANTE.

## V. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING OFFENSES

22.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

b.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

c.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

8

digital devices, including in the form of calendar entries and location data.

23.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

25.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.   That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.   For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.   For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.   Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.   Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  CONCLUSION

28.  Based on the foregoing facts and opinions, and on my training and experience, I believe that there is probable cause to believe that GALLEGOS and BUSTAMANTE violated Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(viii):

Possession with Intent to Distribute Methamphetamine.  I also believe that there is probable cause the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and § 846 (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances) will be found on the SUBJECT DEVICES.

_____/s/_____
Matthew J. Lozowski
DEA Special Agent

Subscribed to and sworn before me
this __19__ day of July, 2019.

**JEAN P. ROSENBLUTH**
_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

12